UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
No. \_\_\_:\_\_\_\_\_-CV-\_\_\_-\_\_\_\_

| | |
|---|---|
| RICHARD D. BERNIER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>Defendant. ) | **COMPLAINT**<br>Fed. R. Civ. P. 3 |

Plaintiff Richard D. Bernier ("Mr. Bernier" or "Plaintiff"), by counsel, states his cause of action against United States of America ("Defendant") as set forth below:

## Jurisdiction and Venue

1. This action arises under the Federal Tort Claims Act of 1948, 62 Stat. 982, 28 U.S.C. §§ 1346(b) and 2671, et seq.

2. This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

3. In compliance with 28 U.S.C. § 2675, Mr. Bernier filed his notice of administrative claim with the appropriate administrative agency—the Department of Veterans Affairs (the "VA")—on April 22, 2016.

4. On August 3, 2016, the VA Office of Chief Counsel, North Atlantic District South, denied Mr. Bernier's administrative tort claims.

5. Mr. Bernier requested reconsideration of the VA's denial of his administrative tort claim on January 25, 2017.

COMPLAINT - 1

6. The request for reconsideration of Mr. Bernier's tort claim was denied by the VA Office of General Counsel for a final time on August 30, 2017.

7. Accordingly, Mr. Bernier's claim is ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because the cause of action arose at the Charles George VA Medical Center located in Asheville, North Carolina ("Asheville VAMC"), and thus, the cause of action arose within the Western District North Carolina.

9. Additionally, Mr. Bernier resides in Weaverville, North Carolina.

10. At all times relevant to this action, the United States owned and operated the Asheville VAMC and employed physicians and other healthcare providers to deliver medical services to its patients.

11. At all relevant times, the agents, servants, employees, and personnel, including but not limited to, physicians, nurses, medical providers, and other healthcare providers at the Asheville VAMC who were involved in the care and treatment of Mr. Bernier were acting within the scope of their employment and/or agency for the United States.

## General Allegations

12. On April 25, 2014, Mr. Bernier presented to the Asheville VAMC for right-eye extracapsular cataract removal with insertion of intraocular lens prosthesis.

COMPLAINT - 2

Case 1:18-cv-00035-MR-WCM   Document 1   Filed 02/14/18   Page 2 of 15

13. Prior to this procedure, Mr. Bernier had no history of eye disease or eye injuries. He had been diagnosed with cataracts and planned to have an additional procedure on his left eye for cataract removal after the April 25, 2014 procedure on his right eye.

14. Asheville VAMC ophthalmologist Chiyeon D. Song, M.D. ("Dr. Song") performed the procedure.

15. During the procedure, a toric marker was used to mark areas of Mr. Bernier's cornea.

16. When the toric marker was placed on his eye, Mr. Bernier squeezed his eye and moved. This resulted in a linear corneal abrasion.

17. Despite this initial complication, Dr. Song elected to continue the procedure.

18. The phacoemulsification and toric lens placement were performed without complications.

19. To close the wound, hydration with balanced salt solution was attempted.

20. The cannula loosened and came off of the syringe into the anterior chamber of Mr. Bernier's eye, tearing the capsule and causing iris bleeding. Vitreous entered the anterior chamber.

21. Dr. Song elected to perform a Weck-Cel vitrectomy and a sweep with a cyclodialysis spatula.

22. Dr. Song documented that no other amount of vitreous was seen in the anterior chamber, and that the lens appeared well-centered and stable.

23. Dr. Song noted that the decision was made to leave the lens in place due to its stability and the potential that more damage would occur if she attempted to remove it.

24. Dr. Song injected miostat "to bring the pupil down," but noted that the iris was "still quite dilated." She went on to document that no area of iris peaking was noted.

25. Mr. Bernier was taken to the recovery room in stable condition following the procedure. His wife was also brought into the recovery room.

26. At or about 1:30 PM on April 25, 2014, in the recovery room, Dr. Song had a discussion with Mr. and Mrs. Bernier regarding the adverse event that had taken place during the procedure.

27. Dr. Song documented this conversation in Mr. Bernier's medical records as a "Clinical Disclosure of Adverse Events."

28. Dr. Song documented that she, Mr. and Mrs. Bernier, and Todd Davidson were present for the discussion.

29. Dr. Song documented that she discussed the adverse event with Mr. and Mrs. Bernier, noting: "I discussed with the [patient] and his wife that during the last step of the surgery, in which the cornea wound is sealed by hydration using a cannula, the cannula came loose and entered the eye causing a tear in the capsule. The extent of damage was not clear; however the intraocular lens implant was stable."

30. Dr. Song went on to document that Mr. Bernier asked if he was going to go blind. In response, Dr. Song noted that going blind "would be highly unusual" given that the damage appeared at that time to be minimal, but she would need to "see how he heals to determine if he would have any residual effects." She further documented that it was possible that he would "heal well with full recovery."

31. Dr. Song additionally apologized to Mr. and Mrs. Bernier. She advised them that normally she would check the equipment but that she did not do so prior to Mr. Bernier's procedure.

32. Mr. Bernier was not advised of the 1151 claims process or of his right to file an administrative tort claim.

33. In the adverse event note, Dr. Song documented that she spoke with Mr. Bernier on the day following the procedure. She documented that he was doing very well with "good vision," but that she advised him to cancel the surgery scheduled for his left eye until the right eye had healed more.

34. On April 26, 2014, Terry Wilson and Dr. Song evaluated Mr. Bernier during an ophthalmology follow up.

35. Dr. Song documented that Mr. Bernier's procedure the previous day was "complicated by cannula in [anterior chamber] while doing stromal hydration at the end of surgery. Intraop and some mild iris bleed and noted to have [anterior] capsule tear subincisionally."

36. Mr. Bernier's vision during this visit was 20/25. He reported some pain and "seeing a green line color" to Terry Wilson.

37. Dr. Song noted anterior chamber cell and flare, that the lens was centered, and that Mr. Bernier was "doing very well." Unlike Mr. Wilson, Dr. Song noted that the patient "denies pain."

38. Dr. Song's plan was to continue Vigamox, prednisolone, and Nevanac.

39. Mr. Bernier returned to the Asheville VAMC on April 30, 2014, one day earlier than scheduled. He reported severe right-sided head pain, dim vision in the right eye, and a floater.

40. Mr. Bernier was evaluated on this date by ophthalmologist technician Linda Moua ("Ms. Moua"), Dr. Song, and "Dr. Stone" (per Dr. Song's note from the visit).

41. Mr. Bernier's vision during this visit was 20/50. Dr. Song documented the presence of anterior capsule rent, and that there was no posterior tear.

42. Dr. Song noted that were fine cells present on examination. She additionally noted the presence of vitreous heme inferiorly, which she attributed to the intraoperative iris bleed moving posteriorly around the zonule.

43. On May 15, 2014, Mr. Bernier was again evaluated by Ms. Moua and Dr. Song.

44. Ms. Moua documented that Mr. Bernier's right eye vision was "slightly dim"

45. During that visit, Mr. Bernier's vision had improved to 20/30+ and the cell had further decreased in the anterior chamber. Anterior rent was still present and Dr. Song noted that the vitreous heme was clearing.

46. On June 4, 2014, Mr. Bernier again returned to the Asheville VAMC's ophthalmology department. He was evaluated by Melissa A. Smith, COA, and ophthalmology resident Lakshmi S. Sonbuchner, M.D., Ph.D. ("Dr. Sonbuchner"). Ernest C. Skidmore, M.D. ("Dr. Skidmore") cosigned the note and Dr. Stone was listed as a second attending.

47. Mr. Bernier reported that the vision in his right eye remained blurred and seemed to be dimmer.

48. The vision in the right eye was documented as 20/60. Dr. Sonbuchner noted that his procedure on April 25, 2014 was "complicated by cannula in a/c causing some iris bleed and likely small zonular weakness."

49. Dr. Sonbuchner noted that the vitreous heme was clearing. They additionally noted that his whole lens/capsule complex appeared more posterior than typical.

50. Mr. Bernier was advised not to proceed with the cataract surgery for his left eye until his right eye had stabilized.

51. By July 10, 2014, Mr. Bernier's vision had decreased to 20/100-1.

52. Dr. Song evaluated Mr. Bernier on July 11, 2014. She documented that his vision remained at 20/100-1.

53. During this visit, Dr. Song documented that a contact lens was tried during the visit to correct anisometropia and depth issues, but that Mr. Bernier did not notice an improvement.

54. Dr. Song additionally documented Mr. Bernier's request for a letter to his employer regarding difficulty he was having driving at night.

55. Mr. Bernier returned to the Asheville VAMC on July 16, 2014 with reports of increased photophobia in the right eye.

56. During the evaluation, his vision was measured at 20/200 with the plano lens.

57. Dr. Skidmore documented that he could find "no reason for the decline" in Mr. Bernier's vision except dry eye.

58. On August 6, 2014, Mr. Bernier presented to a non-VA provider, Asheville Eye Associates, where he was evaluated by Edward Isbey III, M.D. ("Dr. Isbey").

59. Dr. Isbey noted that Mr. Bernier could not "see out of the right eye." He additionally noted Mr. Bernier's complaints of blurred vision, light sensitivity, issues with depth perception, flashes, double vision, and headaches.

60. Dr. Isbey documented that Mr. Bernier was having issues with walking down steps and with driving, noting that he reported having hit a tree and a wall. Mr. Bernier additionally complained of issues with reading.

61. Mr. Bernier's uncorrected vision in the right eye was 20/200 and his final vision was 20/60. Dr. Isbey noted that Mr. Bernier was suffering from: "iridocyclitis, secondary noninfectious; blurring of visual image of both eyes, worsening; anisometropia;" and "after-cataract with vision obscured, right."

62. Dr. Isbey noted that he would discuss Mr. Bernier's case with Dr. Stone and Dr. Song at the VAMC.

63. Mr. Bernier continued to report to the Asheville VAMC ophthalmology department for concerns with the vision in his right eye.

64. On August 19, 2014, Mr. Bernier reported flashes and an occasional veil in his right eye, and his vision was measured at 20/100.

65. Celeste J. Downs, OD, documented the presence of vitreous condensation without retinal involvement and epiretinal membrane (macular pucker), both in the right eye.

66. Mr. Bernier's vision decreased to 20/200 in the right eye by August 28, 2014. During that visit, Dr. Song noted that there was "no further treatment I could offer for the right eye as he is already being treated for inflammation and yag laser would not be a good idea."

67. Dr. Song and other healthcare providers at the Asheville VAMC continued to follow Mr. Bernier, documenting the presence of mild macular pucker in the right eye and his continued complaints of decreased vision. Dr. Song additionally documented the possibility of afferent pupillary defect following an observation by a technician.

68. Upon Dr. Isbey's examination of the right eye on January 14, 2015 at Asheville Eye Associates, Mr. Bernier's vision was 20/200.

69. Mr. Bernier elected to have his left eye cataract surgery performed at Asheville Eye Associates.

70. On April 15, 2016, Dr. Isbey documented that Mr. Bernier was suffering from posterior vitreous detachment of the right eye as well as visually significant posterior capsular opacification.

71. Mr. Bernier's vision has not returned to baseline.

72. Mr. Bernier continues to suffer from right-eye pain, discomfort, photophobia, persistent spots in his vision, decreased depth perception, decreased peripheral vision, and decreased vision.

73. Mr. Bernier additionally suffers from chronic severe headaches and resulting depression.

74. Mr. Bernier will likely require additional ophthalmology follow up care.

75. As a result of his injury at the VA, the vision in Mr. Bernier's right eye is 20/200 and is not correctable.

76. Prior to the procedure, Mr. Bernier was employed full-time selling home oxygen.

77. As a result of his injury at the Asheville VAMC, Mr. Bernier cannot drive at night. Mr. Bernier has been forced to decrease his workload and take a reduction in pay.

78. Mr. Bernier is no longer able to participate in activities he once enjoyed due to his injury.

## Medical Negligence

79. Mr. Bernier re-alleges and restates paragraphs 1 through 78 as if fully stated herein.

80. At all times relevant to this action, the agents, servants, employees, and personnel of the Defendant United State of America were acting within the course and scope of their employment in providing medical care and treatment to Mr. Bernier, a veteran of the United States Armed Forces entitled to such care and treatment.

81. On April 25, 2014, Dr. Song and the Asheville VAMC owed Mr. Bernier a duty to provide him with medical care and treatment consistent with the governing standards of medical care.

82. Dr. Song and the surgical team performing the cataract owed Mr. Bernier a duty to properly perform the procedure, including, but not limited to, securing the cannula and protecting Mr. Bernier's eye from injury during the course of the April 25, 2014 surgical procedure.

83. In particular, as the surgeon, Dr. Song owed Mr. Bernier a duty to perform the April 25, 2014 surgical procedure within the standard of care.

84. Dr. Song and the Asheville VAMC deviated from appropriate standards of medical care in providing medical care and treatment to Mr. Bernier in the following respects:

   a. Failure to take the proper steps to protect Mr. Bernier's right eye during the course of the procedure;

   b. Failure to examine the equipment to be used prior to being the procedure;

   c. Failure to ensure the safety of the equipment being used;

   d. Failure to properly attach the cannula;

   e. Failure to safely and properly perform the procedure, including, but not limited to, allowing the cannula to loosen, come off of the syringe, enter the anterior chamber, and tear the capsule;

   f. Failure to properly monitor Mr. Bernier's right eye during the course of the procedure;

   g. Failure to treat Mr. Bernier's eye injury promptly and appropriately;

   h. Failure to furnish medical services to Plaintiff in accordance with the standards of practice among members of the same healthcare profession with similar training and experience situated in the same or similar community under same or similar circumstances at the time of Plaintiff's treatment, as required by N.C.G.S. § 90-21.12; and

i. Committing other negligent acts and/or omissions in violation of the applicable standards of medical care that may be revealed through additional factual investigation, expert review, and/or discovery.

85. As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Asheville VAMC, Mr. Bernier was caused to suffer physical injury, pain, mental anguish, and physical disability. He has additionally incurred economic damages as a result of the injury and his disability.

86. As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Asheville VAMC, Mr. Bernier suffered an anterior capsule tear in the right eye.

87. As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Asheville VAMC, Mr. Bernier has suffered the following injuries:

   a. Injury to the anterior capsule, iris, vitreous, lens support structures;

   b. Iris hemorrhage;

   c. Vitreous prolapse into the interior chamber;

   d. Persistent iritis;

   e. Vitreous hemorrhage;

   f. Persistent spots in vision;

   g. Permanent vision loss in the right eye;

   h. Suboptimal refraction and anisometropia;

   i. Diplopia;

j. Severe headaches;

k. Major depressive disorder, panic disorder, anxiety, mood disorder, and insomnia;

l. The need for additional medical intervention;

m. Permanent photophobia of the right eye; and

n. Permanent loss of depth perception in the right eye.

88. Accordingly, Mr. Bernier claims the following damages:

a. Compensation for the physical injury and disability suffered by Mr. Bernier;

b. Compensation for the extreme pain, suffering, and mental anguish of Mr. Bernier;

c. Compensation for economic losses sustained as a result of Mr. Bernier's injury;

d. Compensation for Mr. Bernier's loss of enjoyment of life;

e. Compensation for past and future medical expenses; and

f. Compensation for any other damages sustained by Mr. Bernier as a proximate result of the Defendant's negligent acts.

89. For these damages, Plaintiff demands $3,275,000.00 (Three Million Two Hundred Seventy-five Thousand and 00/100 Dollars) in compensation.

**CERTIFICATION PURSUANT TO RULE 9(j) OF THE NORTH CAROLINA RULES OF CIVIL PROCEDURE**

90. In accordance with the requirements of Rule 9(j) of the North Carolina rules of civil procedure, the medical care and all medical records pertaining to the alleged

negligence that are available to Plaintiff after reasonable inquiry have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence, and who is willing to testify that the medical care did not comply with the applicable standard of care.

91.     Said expert witness is willing to testify that the medical care rendered by the Defendant and its employees and agents and referred to herein did not comply with the applicable standards of care for physicians and a hospital with similar training and experience situated in the same or similar communities as those of the employees and agents of the Defendant and the Asheville VAMC under the same or similar circumstances at the time of the alleged acts giving rise to this cause of action.

92.     The reviewing healthcare provider specializes in the same specialty as the agents and employees of the Defendant against whom he will testify and has knowledge of the applicable standards of care by reason of active clinical practice or instruction of students, or in the alternative, the reviewing healthcare provider is a physician qualified under Rule 702(a) of the North Carolina Rules of Evidence who by reason of active clinical practice or instruction has knowledge of the applicable standard of care for ophthalmologists and for hospitals performing ophthalmology procedures, such as the Asheville VAMC.

93.     Should the Court later determine that any of the reviewers described above do not meet the requirements of Rule 702(b) or 702(c) of the North Carolina Rules of Evidence, Plaintiffs will seek to have such reviewers qualified as expert witnesses by motion under Rule 702(e) of the North Carolina Rules of Evidence.

COMPLAINT - 14

Case 1:18-cv-00035-MR-WCM   Document 1   Filed 02/14/18   Page 14 of 15

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in his favor against Defendant as prayed for above and award him such other further relief as is just and equitable under the circumstances.

Respectfully Submitted,

RICHARD D. BERNIER

By:   s/ Joseph T. McFadden, Jr.
Joseph T. McFadden, Jr.
Rawls Law Group, P.C.
211 Rocketts Way, Suite 100
Richmond, VA 23231
(804) 344-0038
(804) 782-0133 facsimile
tmcfadden@rawlsmcnelis.com
NC Bar No.: 17741
*Attorney for Plaintiff*

COMPLAINT - 15

Case 1:18-cv-00035-MR-WCM   Document 1   Filed 02/14/18   Page 15 of 15